## Exhibit List

**Exhibit A:**  **Interrogatory Answers of Denise Colon**

**Exhibit B:**  **Deposition of Kenrick Forde**

**Exhibit C:**  **Deposition of Robert Burrus**

**Exhibit D:**  **Rule 30 (b)(6) Deposition of Bob's Discount Furniture by its agent Robert Dawley**

**Exhibit E:**  **Deposition of Raul Santos**

**Exhibit F:**  **Collision Reconstruction Analysis of Stephen Benanti**

**Exhibit G:**  **Affidavit of Counsel**

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHISETTS

| | | |
|---|---|---|
| JOHANZ X. SANTOS, ppa, DENISE COLON,<br>DENISE COLON, Individually, JESUS SANTOS, | )<br>)<br>) | C.A. No.: 03-12210MLW |
| Plaintiffs, | )<br>)<br>) | |
| v. | )<br>) | |
| BOB'S DISCOUNT FURNITURE; REGENT<br>HOME DELIVERY; AGNILIZ ACOSTAS;<br>RAUL SANTOS, | )<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## PLAINTIFF DENISE COLON'S ANSWERS TO INTERROGATORIES PROPOUNDED BY THE DEFENDANT, BOB'S DISCOUNT FURNITURE

### INTERROGATORY NO. 1

Kindly state your name, residential address, occupation, social security number and date of birth.

### ANSWER NO. 1

Denise Colon Santos
7427 Bannard Avenue
Pennsauken, NJ 08110
Transit Driver, Laidlaw Transit Services, New Jersey
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
8/19/1972

### INTERROGATORY NO. 2

How are you related to Johanz Santos?

### ANSWER NO. 2

Mother

1

**INTERROGATORY NO. 3**

If you claim to have been injured by the accident that occurred on March 30, 2002, kindly state with specificity each and every injury that you claim.

**ANSWER NO. 3**

I suffered severe emotional distress as a result of my son's accident and injuries.

**INTERROGATORY NO. 4**

Kindly state where you were and what you were doing on March 30, 2002 at the accident which is the subject matter of this suit.

**ANSWER NO. 4**

I was visiting family in Springfield, MA. My son Johanz was playing baseball with the other children. He went to get a ball that had gone into the street. There was a Bob: Discount Furniture delivery truck illegally parked in a "No Parking" zone outside the building located at 27 Federal Street in the area where Johanz was playing. As my son went out into the street, in front of the illegally parked truck, after the ball he was struck by a vehicle operated by Raul Santos. I was watching my son and the other children from the window. We immediately ran downstairs to see our son. My son sustained serious and permanent injuries as a result of this incident.

**INTERROGATORY NO. 5**

Kindly state with specificity how you claim the accident happened.

**ANSWER NO. 5**

I was visiting family in Springfield, MA. My son Johanz was playing baseball with the other children. He went to get a ball that had gone into the street. There was a Bob's Discount Furniture delivery truck illegally parked in a "No Parking" zone outside the building located at 27 Federal Street in the area where Johanz was playing. As my son went out into the street, in front of the illegally parked truck, after the ball he was struck by a vehicle operated by Raul Santos. I was watching my son and the other children from the window. We immediately ran downstairs to see our son. My son sustained serious and permanent injuries as a result of this incident.

**INTERROGATORY NO. 6**

If you do not personally witness the accident when and how was it that you first heard of the accident?

2

# EXHIBIT "B"

1

UNITED STATES DISTRICT COURT

No. 03-CV-12210

JOHANZ X. SANTOS, ppa,
DENISE COLON, DENISE COLON,
Individually, JESUS SANTOS
            Plaintiffs

vs

BOB'S DISCOUNT FURNITURE,
REGENT HOME DELIVERY,
AGNILIZ ACOSTAS, RAUL SANTOS
            Defendants

DEPOSITION OF KENRICK D. FORDE,

taken before ANN A. PRESTON, Notary Public

and Court Reporter, pursuant to Rule 30 of

the Massachusetts Rules of Civil Procedure,

at the offices of Facchini and Facchini,

824 Liberty Street, Springfield,

Massachusetts, commencing at 11:00 on

March 21, 2005.

Ann A. Preston
Certified Shorthand Reporter

PERLIK and COYLE REPORTING
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel (413) 731-7931     Fax (413) 731-7451

PERLIK and COYLE REPORTING

5

```
1              KENRICK D. FORDE, Witness, identified via
2     Connecticut driver's license and having been duly
3     sworn, states as follows:
4
5              DIRECT EXAMINATION BY MR. ANGUEIRA:
6         Q.    Good morning, sir.  What is your name?
7         A.    My name is Kenrick D. Forde.
8         Q.    Mr. Forde, my name is David Angueira.  I
9     represent the Santos family in a lawsuit that's
10    been brought against certain individuals, including
11    your previous employer, Bob's Discount Furniture.
12    I have, on behalf of the plaintiff, served you with
13    a federal subpoena to appear for your presence
14    today, and you have honored that subpoena, correct?
15        A.    Yes, sir.
16        Q.    You are not represented by counsel in
17    this deposition, so I'm required to inform you of
18    what these proceedings will entail.  This is a
19    civil proceeding.  There is no lawsuit against you.
20    There are no criminal issues raised in this case at
21    all.  This is simply a process by which we, as
22    counsel for the parties, have an opportunity to ask
23    certain witnesses who may have information
24    questions about this incident -- and this incident
```

1    are very difficult, if not impossible, to put on a

2    piece of paper accurately.  So if you use a gesture

3    or sound instead of a word, I may ask you to please

4    repeat it verbally so that we're sure of what your

5    testimony is.

6            Have you understood everything I've said

7    so far?

8        A.    Yes.

9        Q.    Where do you live, sir?

10       A.    I live at 116 McClintock Street.   That's

11   New Britain, Connecticut.

12       Q.    What is your social security number?

13       A.    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.

14       Q.    And what is your date of birth, sir?

15       A.    06/22/1957.

16           MR. ANGUEIRA:   Now, before we continue

17           with the questioning, I want to state for the

18           record that this deposition is being taken

19           pursuant to a deposition notice that was

20           served along with a federal subpoena on

21           Mr. Forde.  A copy of that deposition

22           subpoena and notice was served upon defense

23           counsel, both Mr. Faille and Smith and Brink,

24           in this case, with an appropriate certificate

1    educational background for me, Mr. Forde?

2         A.   I graduated from New Britain High School

3    in June of 1976, and I later -- I got an Associates

4    in Science from Tunxis Community College in 1986.

5         Q.   What's your work background; what kind

6    of work have you had?

7         A.   I'm a truck driver by trade.

8         Q.   Are you licensed or certified to drive

9    certain types of vehicles?

10        A.   Yes, sir, Class A, CDL.

11        Q.   Are those -- for the common person --

12   those big tractor trailers that we see on the road?

13        A.   You got it, yes.

14        Q.   How long have you been driving those

15   vehicles, sir?

16        A.   Since 1991.

17        Q.   Where do you drive those types of

18   vehicles?

19        A.   Well, I'm due in Cincinnati tomorrow.

20   Wherever -- 48 states, basically, I go.

21        Q.   You've been doing that for how many

22   years, sir?

23        A.   Oh, since 1991.

24        Q.   At some point in time, were you employed

1    by a company by the name of Bob's Discount

2    Furniture?

3          A.   Yes, sir.

4          Q.   For how long were you employed with that

5    company?

6          A.   Probably three months or less.

7          Q.   Prior to your employment with Bob's

8    Discount Furniture, what kind of job did you have?

9          A.   I was driving tractor trailers.

10         Q.   What was the name of your employer at

11   that time?

12         A.   Previous to -- New World Van Lines in

13   Cranberry, New Jersey.

14         Q.   And approximately how long did you work

15   as a truck driver for New World Van Lines?

16         A.   Couple of months.

17         Q.   Prior to that, where did you work, sir?

18         A.   I worked for Bernie's TV and Appliances.

19         Q.   What type of work did you do for

20   Bernie's?

21         A.   Pretty much same thing as Bob's.

22   Delivering appliances to people's homes.

23         Q.   I want to direct your attention, if I

24   may, to the date of March 30 of 2002.  Were you

1      employed at Bob's Discount Furniture at that point

2      in time?

3           A.    I believe so.

4           Q.    Do you recall an incident occurring on

5      that day at or around the area Federal Street in

6      Springfield where a little boy was struck by a

7      vehicle?

8           A.    Yes, sir.

9           Q.    On the day in question of March 30,

10     2002, were you on the job with Bob's Discount

11     Furniture that day?

12          A.    Yes.

13          Q.    And were you assigned to go to a certain

14     location to deliver some furniture?

15          A.    Yes, sir.

16          Q.    Do you remember what the address of that

17     location was?

18          A.    No, I do not.

19          Q.    If I were to suggest to you that the

20     records of Bob's Discount Furniture reflect that

21     there was some deliveries made by you and another

22     gentleman in the truck, Mr. Robert Burrus, to

23     27 Federal Street in Springfield, does that refresh

24     your recollection of the address where you were

PERLIK and COYLE REPORTING

1    2002, who was driving the truck that day?

2         A.    Rob was driving the truck when we pulled

3    up to -- I believe the address is -- 27 Federal

4    Street, when we pulled up to the building.

5         Q.    Do you remember what time of the day it

6    was, approximately, when you pulled up to that

7    location?

8         A.    Not accurately, no.  I know that it was

9    probably sometime around noon.  I don't know if it

10   was before the noon hour, but it was sometime

11   during the day, I don't recall exactly.

12        Q.    Fair enough.  And you say that Rob

13   Burrus, Mr. Burrus, was driving the truck at the

14   time?

15        A.    Yes, sir.

16        Q.    Do you remember anything about what

17   occurred at the time that Mr. Burrus parked the

18   truck in front of 27 Federal Street?

19        A.    Vividly.  I remember that I was

20   reviewing what I needed to -- I was looking at the

21   delivery ticket, and as he pulled up, he said,

22   There is a -- there is a ramp in back, but -- then

23   I looked at the No Parking sign.  And he says, But

24   -- because I gave him a look, well, don't you see

1    the No Parking sign there.  And he says, But I'm

2    going to park here anyway.  I vividly remember him

3    making that statement.

4         Q.    Let me stop you there for a moment.

5    When you and he pulled up in front of Federal

6    Street, you noticed there was a No Parking sign in

7    the area where he had parked the truck, right?

8         A.    Clearly, clearly.

9         Q.    It's your memory to that that you heard

10   Mr. Burrus say something about a ramp in the back?

11        A.    A ramp in the back, there's a ramp in

12   the back.  He had been there several times.

13   Mr. Burrus was one of the more experienced guys

14   there.  Some of the buildings require recurring

15   deliveries.  A lot of the people shop at Bob's in

16   the Springfield area, a lot of the people come on

17   down to Bob's.  He had obviously been to the

18   building before a lot, like a lot of the buildings.

19   He knew there was some sort of ramp in the back.

20        Q.    Had you ever been to that building

21   before?

22        A.    No.

23        Q.    Tell me again what you heard Mr. Burrus

24   say after he said there was a ramp in the back.

```
 1          A.    But -- he said -- But I am going to park
 2    here anyway.
 3          Q.    When you heard him say that, I'm going
 4    to park here anyway, and you noticed a No Parking
 5    sign in the front, did you say anything?
 6          A.    No.
 7          Q.    He was driving the truck when it was
 8    parked in the No Parking area in front of
 9    27 Federal Street, correct?
10          A.    Yes, sir.
11          Q.    Where were you seated at the time that
12    Mr. Burrus parked the truck in front of this No
13    Parking sign?
14          A.    I was seated in the passenger side of
15    the truck.
16          Q.    You said that you were reviewing the
17    delivery documentation?
18          A.    Yes, sir.
19          Q.    Then at some point in time, did you and
20    Mr. Burrus begin to deliver furniture to an
21    apartment at 27 Federal Street?
22          A.    Yes, Mr. Burrus basically stayed inside
23    the building, and I was shuttling the stuff back
24    and forth from the truck to him inside the
```

18

1    apartment.

2        Q.    If I showed you a copy of an invoice

3    provided to us by Bob's Discount Furniture, is this

4    the invoice reflecting the furniture that was being

5    delivered by you and Mr. Burrus on March 30, 2002

6    to 27 Federal Street?

7        A.    Yes, sir.  I recall it vividly now,

8    looking at this document.

9            MR. ANGUEIRA:  Let's mark Exhibit 1.

10           (Exhibit 1, 2/8/02 Bob's Discount

11           Invoice, marked for identification)

12       Q.    (By Mr. Mr. Angueira)  Now, sir, you

13   mentioned that Rob stayed upstairs in the apartment

14   while you carried the furniture from the truck into

15   the apartment building?

16       A.    Yes, sir.

17       Q.    I take it from looking at the invoice

18   that -- well, I shouldn't assume anything; let me

19   ask you, because you were there and you're much

20   more experienced than I am with this kind of a

21   delivery.  Would you have been able to carry all of

22   this furniture on one trip, or did it require

23   multiple trips?

24       A.    It required multiple trips.

1          Q.    When you and Mr. Burrus first got there,

2     did the two of you go to the apartment location

3     where the furniture was to be delivered?

4          A.    Yes, yes.

5          Q.    And then did Mr. Burrus stay in the

6     apartment to begin the assembly of the furniture

7     while you went back and forth to get the other

8     furniture?

9          A.    You can be sure of that.  There were

10    several attractive women in the apartment building,

11    and Mr. Burrus wasn't going anywhere.

12         Q.    So Mr. Burrus didn't help you at all in

13    carrying the furniture?

14         A.    No, he basically just installed it into

15    the rooms as I brought it up and to him.

16         Q.    Do you know how many trips up and down

17    the delivery took?

18         A.    No, but I know the delivery must have

19    taken well over an hour to accomplish.

20         Q.    When you had to leave the truck and

21    knowing Mr. Burrus was upstairs, was there any

22    procedure that you had to lock up the truck or at

23    least close it to make sure nothing gets lost?

24         A.    I guess you can say that, a minimum

29

1       you want to call them.  It used to get me so sick.

2       I mean, you'd see him, he would be doing something

3       and looking underneath the table looking at a

4       woman's body secretly about it.  It used to get me

5       so sick.

6            Q.    At some time when the delivery was

7       completed, you and Mr. Burrus were back in Bob's

8       Discount Furniture's truck?

9            A.    Yes, we were.

10           Q.    When it was just the two of you, did you

11      find some moments to think about or reflect about

12      what had just happened?

13           A.    Several moments.

14           Q.    After you had some time to think about

15      what had happened and thought about what you had

16      just seen; did you form any opinion in your mind as

17      to whether or not you believed that the position of

18      the truck being parked in front of that No Parking

19      area had anything to do in any way with this

20      accident happening to this little child?

21           A.    Immediately I had realized that, you

22      know.  The legal impact or whatever hadn't entered

23      my mind, but I knew that just when I heard the

24      screeching the tires, if the car was obstructed

1    from me, certainly from the perspective of the

2    person driving that car, anything that was coming

3    off of the sidewalk into the street would be

4    obstructed from him.  I mean, it was just that

5    simple.

6         Q.    So did you form the opinion in your mind

7    that the child that had come in front of the truck

8    that was illegally parked, that his visibility was

9    obstructed from the driver of the car because of

10   the truck?

11        A.    Both the driver of the truck and the

12   child who got hit, their vision was obstructed from

13   each other in general.

14        Q.    In your opinion, that obstructed vision

15   of visibility occurred as a result of the illegally

16   parked Bob's Discount truck, right?

17        A.    Yes, the driver didn't have a chance.

18        Q.    Similarly, the child didn't have a

19   chance, either, correct?

20        A.    Not much of a chance, no, not much of a

21   chance.

22        Q.    Similarly, do you have an opinion as to

23   whether or not if the truck had not been parked

24   there, do you believe that this accident would have

31

1    even happened?

2        A.    I believe that if the truck had not been

3    parked there, that we wouldn't be sitting right

4    here and that boy would not be in the hospital

5    right now, is what I believe.

6        Q.    For example, had Mr. Burrus decided to

7    take the truck and park it in the back where he

8    knew there was a ramp and make the delivery, in

9    your opinion would this accident have happened?

10        A.    No, it would not have.  Those signs were

11    there for a reason.  It was tantamount because of

12    safety.

13        Q.    Which signs?

14        A.    No Parking signs.  No Parking zone

15    sitting right there.  It was clear to Rob, it was

16    clear to me as soon as we pulled up.

17        Q.    In your opinion, sir, was Mr. Burrus in

18    violation of company rules or procedures by

19    illegally parking a truck in an area that had

20    clearly designated no parking?

21        A.    Mr. Burrus was in violation of the law,

22    period, because it had been clearly marked that was

23    a no parking, no loading zone.

24        Q.    When you and Mr. Burrus -- strike that.

PERLIK and COYLE REPORTING

# EXHIBIT "C"

1

```
 1                                    Volume:  I

 2                                    Pages:  1-97

 3                                    Exhibits:  1

 4              UNITED STATES DISTRICT COURT

 5              District of Massachusetts

 6                  Western Division

 7   - - - - - - - - - - - - - - - - - - x

 8   JOHANZ X. SANTOS, ppa, DENISE COLON,

 9   DENISE COLON, Individually, JESUS

10   SANTOS,                          Civil Action No.

11              Plaintiffs,           03-12210-MLW

12   vs.

13   BOB'S DISCOUNT FURNITURE, REGENT HOME

14   DELIVERY, AGNILIZ ACOSTAS and RAUL

15   SANTOS,

16              Defendants.

17   - - - - - - - - - - - - - - - - - - x

18              DEPOSITION OF ROBERT BURRUS

19              Thursday, November 4, 2004

20              Faille, Birrell & Daniels

21                 1414 Main Street

22              Springfield, Massachusetts

23              Commencing at 12:18 p.m.

24         Reporter:  Karen A. Morgan, CSR/RPR
```

1    happy to accommodate you; all right?

2        A.    Yes, sir.

3        Q.    What is your name, please?

4        A.    Robert Lee Burrus, Jr.

5        Q.    Where do you live, Mr. Burrus?

6        A.    39 Pine Street, Meriden, Connecticut 06451.

7        Q.    What is your Social Security number?

8        A.    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.

9        Q.    What is your date of birth?

10       A.    9/27/73.

11       Q.    And, Mr. Burrus, have you ever been arrested

12   and convicted of a criminal offense?

13       A.    Yes, sir.

14       Q.    And tell me when is the last time that you

15   were arrested and convicted?

16       A.    I think it was '93.  1993.

17       Q.    And what were you arrested for?

18       A.    Sales of narcotics.

19       Q.    And do you recall the specifics of the charge

20   that you were convicted of?

21       A.    Yes.

22       Q.    What were they?

23       A.    Sales of narcotics within 1500 feet of a

24   school zone.

57

1      Q.   You don't know remember?

2      A.   No.

3      Q.   But your memory today is that after the fact

4   you don't remember seeing any sign; correct?

5      A.   Right.

6      Q.   That's your testimony?

7      A.   That's my testimony.

8      Q.   Now when was the first time that you --

9   Strike that.  When you first got to this location and

10   you and Mr. Ford were in the process of bringing up

11   furniture and tools also?  Did you have to bring tolls

12   up?

13      A.   Drill, drill case.

14      Q.   Just a drill.  When you and Mr. Ford were in

15   the process of doing that work, did you see anybody

16   around the sidewalk in front of 27 Federal?

17      A.   Yes.

18      Q.   Who did you see?

19      A.   At the time we were doing the delivery?  I

20   just want to make sure I'm right.

21      Q.   Yes.

22      A.   Yes.  I seen some kids.

23      Q.   How many kids?

24      A.   I don't know.

1      Q.    Okay.  Now, if there was a no parking sign

2    there, sir, where you parked your truck, you understood

3    that you were not allowed to park there; correct?

4          A.    If there was a no parking sign there?

5          Q.    Yes.

6          A.    Yes, sir.

7          Q.    You understood that if there was a no parking

8    sign in front of 27 Federal Street and you parked your

9    truck in that location that you would have been in

10   violation of the law; correct?

11         A.    Yes.

12         Q.    And you understand that if there was a no

13   parking sign at that location and you parked your truck

14   there and in violation of that sign and this little boy

15   came out in front of the truck that your truck

16   obstructed the visibility of this car in seeing that

17   little boy; correct?  Isn't that fair to say?

18         A.    Yes.

19         Q.    I mean it's really simple, isn't it?  If this

20   little boy came running or walking from the sidewalk in

21   front of your parked truck that was parked there when

22   there was a no parking sign and the driver comes down

23   this road, that driver won't be able to see that little

24   kid because he's smaller than the truck; right?

74

1     if there was a no parking sign there on the date of

2     March 30, 2002, you should not have parked your truck

3     there; right?

4         A.   Yes.

5         Q.   And you understood that if you did park your

6     truck there on that date when that no parking sign

7     existed, if you did park it there, that was a violation

8     of your company's safety policies, wasn't it?

9         A.   I would assume so, yes.

10        Q.   If you parked your truck there on the day

11    when this no parking sign was there and as a result of

12    being in that location illegally parked that blocked

13    the vision of the driver of this car and caused him to

14    hit that little kid, you understand that your truck

15    being there in that location illegally parked

16    contributed to cause this accident, didn't it?

17              MR. FAILLE:   I object to the form.

18        Q.   Didn't it, sir?

19              MR. FAILLE:   I object to the form.

20              MR. ANGUEIRA:   I understand.

21        Q.   Didn't it, sir?

22        A.   If you say so.

23        Q.   No.   I can't say so.   I need you to either

24    agree or disagree.   Do you understand the question?

1       A.    No.

2            Q.    Let me repeat it again.  You understand that

3       if you were parked here illegally, and I know you say

4       there was no sign.

5       A.    Yes.

6            Q.    But if you were parked here illegally because

7       there was a no parking sign and the driver of this car

8       coming down the street couldn't see that little kid

9       coming out in front of the truck and he hit little kid,

10      you understand that part of the reason why he hit that

11      little kid is because you were illegally parked there

12      blocking his vision; right?

13                 MR. FAILLE:  I object.

14           Q.    It's common sense, isn't it?  Answer the

15      question, please.

16      A.    I guess so, yes.

17           Q.    After you left this location, did you have

18      any more deliveries to make, sir?

19      A.    I can't remember.

20           Q.    You don't remember?

21      A.    I don't remember.

22           Q.    Do you remember if when you went back to work

23      at any time you ever told anybody at Bob's Discount

24      that, hey, look, this incident happened.  I had to call

# EXHIBIT "D"

1

```
 1                                   Volume:  I
 2                                   Pages:  1-82
 3                                   Exhibits:  1-10
 4              UNITED STATES DISTRICT COURT
 5              District of Massachusetts
 6                   Western Division
 7    - - - - - - - - - - - - - - - - - x
 8    JOHANZ X. SANTOS, ppa, DENISE COLON,
 9    DENISE COLON, Individually, JESUS
10    SANTOS,                          Civil Action No.
11                Plaintiffs,          03-12210-MLW
12    vs.
13    BOB'S DISCOUNT FURNITURE, REGENT HOME
14    DELIVERY, AGNILIZ ACOSTAS and RAUL
15    SANTOS,
16                Defendants.
17    - - - - - - - - - - - - - - - - - x
18              DEPOSITION OF ROBERT DAWLEY
19              Thursday, November 4, 2004
20              Faille, Birrell & Daniels
21                   1414 Main Street
22              Springfield, Massachusetts
23              Commencing at 10:12 a.m.
24         Reporter:  Karen A. Morgan, CSR/RPR
```

1      answer.  I would also ask that you always respond

2      orally, that is with words as opposed to just sounds or

3      hand gestures so that an accurate record can be made.

4      Also, if you need to take a break for any reason at

5      all, please let us know and we will be happy to

6      accommodate you.  What is your name?

7          A.    Robert Dawley, D-A-W-L-E-Y.

8          Q.    Mr. Dawley, have you understood everything I

9      have just told you?

10         A.    Yes.

11         Q.    Where do you live, Mr. Dawley?

12         A.    24 Beechwood, with two E's, Boulevard,

13     Norwich, Connecticut 06360.

14         Q.    How long have you resided at that address?

15         A.    Since 1981.

16         Q.    And in terms of your educational background,

17     Mr. Dawley, did you complete high school?

18         A.    Yes.

19         Q.    Did you complete any college courses?

20         A.    No.

21         Q.    Where did you go to high school?

22         A.    Norwich Free Academy.

23         Q.    And what is your date of birth, please?

24         A.    9/13/1955.

1       Q.    What do you do for Bob's Discount?

2       A.    I'm the benefits manager.

3       Q.    And what are your duties and responsibilities

4    as the benefits manager?

5       A.    My duties include overseeing all of the

6    employee benefits including health, dental, 401K.

7    Additionally, I also oversee all of the loss control in

8    regards to vehicle accidents, workers compensation,

9    property damage or customer liability incidents.

10      Q.    And when you assumed the position at Bob's

11   Discount Furniture of overseeing loss control as you

12   have described it, did you receive any training or

13   education from Bob's Discount to fulfill those

14   responsibilities?

15      A.    I worked in conjunction with our insurance

16   broker and insurance companies on training.

17      Q.    And tell me precisely what type of training

18   you received from those individuals or entities

19   regarding those subject matters.

20      A.    Accident investigation training, also safe

21   lifting and back injury prevention.  There probably was

22   some other that I can't presently.

23      Q.    When did you receive the accident

24   investigation training?

9

```
1         A.    In 2001.

2         Q.    And when in 2001?

3         A.    Early part of 2001.  I don't know the

4    specific month.

5         Q.    Was it before or after the Santos accident

6    occurred if you recall?

7         A.    Probably a year prior.

8         Q.    And tell me as much as you can in as much

9    detail as you can what this accident investigation

10   training consisted of.

11        A.    It consisted of how to conduct a proper

12   accident investigation, how to determine what the cause

13   of and look for measures that would be used to prevent

14   a similar accident in the future.

15        Q.    And tell me what you learned about how to

16   conduct a proper investigation in that training.

17        A.    Could you -- I'm not clear on the question.

18        Q.    Sure.  You said they taught you how to

19   conduct a proper investigation.  That was part of your

20   training; correct?

21        A.    Yes.

22        Q.    What did they teach you about that?

23        A.    They taught me how to look for the root cause

24   of the accident, interview all of the witnesses that
```

1    were present, if it involved machinery or equipment to

2    look to see if there was a problem with that in terms

3    of contributing to the cause, identifying what the

4    causes of the accident were and then to take that

5    information and to create a policy or procedure which

6    would allow you to again maybe train other associates

7    to prevent a similar occurrence in the future.

8         Q.    And these were all responsibilities that you

9    had in the normal course of your position as the

10   benefits director for Bob's Discount; is that correct?

11        A.    Yes.  Well, I would need to clarify that.

12        Q.    Sure.

13        A.    I have been the benefits manager since

14   October of 2003.  Prior to that I was the loss control

15   manager, and at the time of the accident that we are

16   here to discuss, I was the loss control manager for the

17   company at that time.

18        Q.    Okay.  So in your position as the loss

19   control manager it was your responsibility as part of

20   the regular course of your business to conduct the kind

21   of investigation that you just described if in fact

22   there was any accident involving a Bob's Discount

23   employee?

24        A.    Yes.

1      Q.    Did anybody else in the organization assist

2    you in that type of an investigation or was it

3    primarily your responsibility?

4      A.    It was my responsibility.  However, depending

5    upon the situation involving the accident, we have

6    multiple store locations and multiple depots.  It would

7    not be uncommon to use the supervisor at the location

8    to conduct the initial report and then review it with

9    myself.

10      Q.    And was it part of your regular course of

11    business as the loss control manager for Bob's Discount

12    when conducting this type of an investigation to

13    prepare written documentation regarding the

14    investigation?

15      A.    Yes.

16      Q.    Would you as part of your regular course of

17    responsibilities and duties obtain written witness

18    statements if witnesses were available?

19      A.    Yes.

20      Q.    And would you also try to visit the site or

21    have the site visited for the purpose of taking

22    photographs or creating sketches of the area?

23      A.    Depending upon the seriousness of the

24    accident, yes.

1       Q.    And in addition to creating witness

2    statements as part of the regular course of business

3    and taking photographs if you determined it was

4    necessary, what other information would you gather as

5    part of the investigation if there was an accident

6    involving personal injury?

7       A.    Normally if it was involving a motor vehicle

8    accident, we would obtain a copy of the police report

9    as a routine part of the procedure.

10      Q.    I want to go back to the time period when you

11   were the loss control manager as of March 30th of 2002

12   which brings us to the date of the incident involved in

13   this case and ask you a couple of general questions

14   about that time period.  How many employees did Bob's

15   Discount have at that point in time if you know?

16      A.    I would be making an educated guess.  An

17   estimate would be approximately 700 to 750.

18      Q.    And how many of those individuals if you know

19   even taking into account your knowledge today as the

20   benefits director were delivery people involved in

21   driving trucks or delivering the furniture to

22   customers?

23      A.    Again, I would be giving you my best

24   estimate.  Approximately 70 to 75.

1       Q.   Okay.  Did you --

2       A.   There is a date that I sent the e-mail to

3    Adele at Webster which is on here as Friday, September

4    6th so it had to be before that time because obviously

5    that was included in my notes to her.

6       Q.   Thank you.  Did you make any effort to talk

7    to Mr. Ford?

8       A.   No, I did not.

9       Q.   Was that because he was gone at the time from

10   the company?

11      A.   He was no longer employed with the company at

12   that time so I did not contact him.

13      Q.   Now during the course of your involvement in

14   this case from the date of the notice to the present,

15   did you learn from any source other than your counsel

16   that in fact there were no parking signs in front of 27

17   Federal Street on the day this accident occurred?

18      A.   No.

19      Q.   You haven't seen any photographs or anything

20   that shows a parking sign?

21      A.   No.

22      Q.   If there was a no parking sign in front of 27

23   Federal Street on March 30th of 2002, did you expect an

24   employee like Mr. Burrus or Mr. Ford to park a delivery

69

1    vehicle in front of that building to make their

2    delivery?

3        A.    No.

4        Q.    Would that have been a violation of company

5    policy and safety policy to do that?

6        A.    Yes.

7        Q.    And would that have been grounds for

8    disciplinary action against Mr. Burrus or whoever was

9    driving the truck?

10       A.    Yes.

11       Q.    And would the disciplinary action have

12   included things like additional training, safety

13   courses and possible probation or suspension?

14       A.    Yes.

15       Q.    And what would your recommendation have been

16   had you found out that in fact there was a no parking

17   sign and Mr. Burrus was lying to you about the

18   existence of that sign, sir?

19             MR. FAILLE:   I object.

20       Q.    What would you recommend be done with him?

21             MR. FAILLE:   You can answer.

22       A.    Well, if in fact I could determine that he

23   lied, that's a different situation than if he didn't

24   observe one that was there.  If in fact I found out he

1   lied to me, then my recommendation would be suspension

2   or termination based upon what else was in his

3   personnel file.

4       Q.   Now did you think that the driver of one of

5   Bob's truck as of March 30, 2002 had the responsibility

6   to look at traffic signs including no parking signs

7   before they parked a vehicle for delivery purposes in

8   that location?

9       A.   Yes.

10      Q.   And to your understanding was it company

11  policy, Bob's company policy that drivers were to

12  observe all types of traffic signs, no parking signs,

13  any type of motor vehicle signs and perform their

14  responsibilities in the safest manner possible?

15      A.   Yes.

16      Q.   That was the primary safety policy of Bob's

17  Discount Furniture at all times, wasn't it, sir?

18      A.   Yes.

19      Q.   And any violation of that policy by a driver,

20  an employee of Bob's Discount would warrant some kind

21  of disciplinary action; correct?

22      A.   Yes.

23      Q.   Have you ever seen any witness statements

24  from any source whatsoever regarding this incident?

1       Q.    If a no parking sign was present in front of

2   27 Federal Street on the day of the Santos incident and

3   your driver, delivery personnel failed to observe it or

4   did not see it, do you consider that a violation of the

5   company's safety policies in failing to see a no

6   parking sign?

7       A.    Yes.

8       Q.    And if Mr. Burrus simply failed to observe

9   the no parking sign or for whatever reason didn't see

10  it, do you think that that warrants some type of

11  additional training or further disciplinary action?

12      A.    Yes.

13      Q.    What type of disciplinary action would you

14  recommend as the loss control manager assuming those

15  facts to be true, sir?

16      A.    Based upon Mr. Burrus's history with the

17  company at the time of the accident and the fact he had

18  a clean driving record and no prior issues that I was

19  aware of, I would recommend that he have some

20  additional training and put a documented coaching in

21  his file.

22      Q.    What is a documented coaching?

23      A.    It means basically documenting that we sat

24  down, reviewed the report and that he is to pay more

1

```
 1                              Volume I, Pgs. 1-42

 2             COMMONWEALTH OF MASSACHUSETTS

 3        Hampden, ss              Superior Court

 4                                 No.03-CV-12210MLW

 5    JOHANZ X. SANTOS, PPA,    )

 6    DENISE COLON,             )

 7    DENISE COLON, INDIVIDUAL, )

 8    JESUS SANTOS,             )

 9              Plaintiffs      )

10    v.                        )

11    BOB'S DISCOUNT FURNITURE; )

12    REGENT HOME DELIVERY;     )

13    AGNILIZ ACOSTAS;          )

14    RAUL SANTOS,              )

15              Defendants      )

16

17             DEPOSITION OF RAUL SANTOS

18              Friday, October 29, 2004

19                   1:53 p.m.

20           FACCHINI & FACCHINI, P.C.

21              824 Liberty Street

22        Springfield, Massachusetts 01101-4052

23        - - - - - - Terri Clarno - - - - - -

24
```

```
 1      Angueira.  I represent the plaintiffs in this action.

 2      I'm going to be asking you some questions.  Please

 3      make sure that you listen to my question.  Wait

 4      until I finish the question and then answer the

 5      question, please.

 6              If you could always answer the question

 7      with words, not sounds or gestures.  If you need to

 8      take a break for any reason, please let us know and

 9      we'll be happy to accommodate you.  If you need to

10      talk to your lawyer for any reason, let us know and

11      we'll be happy to accommodate you as well.  Have you

12      understood everything that I've said?

13                          THE WITNESS:  Yes.

14                          DIRECT EXAMINATION

15      BY MR. ANGUEIRA:

16          Q.   What is your name, sir?

17          A.   Raul Santos.

18          Q.   Have you been able to understand everything

19      the interpreter has told you?

20          A.   Yes.

21          Q.   Because we have an interpreter, make sure

22      that you wait for every question to be interpreted

23      into Spanish before you answer it.  Do you

24      understand that?
```

7

```
 1          A.  Yes.
 2                    MR. FAILLE:  And respond to in
 3     Spanish too might be the best advice.
 4          Q.  That's important as well.  Where do you
 5     live, sir?
 6          A.  49 Eureka Street.
 7          Q.  Is that in Springfield?
 8          A.  Yes.
 9          Q.  What is your date of birth?
10          A.  June 14, 1973.
11          Q.  What is your Social Security number?
12          A.  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.
13          Q.  Do you speak any English?
14          A.  A little.
15          Q.  What's the last grade that you completed?
16          A.  I graduated from high school obtaining a
17     GED.
18          Q.  Did you go to high school in the United
19     States or back in Puerto Rico?
20          A.  Puerto Rico.
21          Q.  When did you come to the United States from
22     Puerto Rico?
23          A.  It's been seven years.
24          Q.  Who do you live with?
```

24

```
1     conditions straight ahead?
2                    MR. ROUX:  Objection.  He can
3     answer.
4         A.   Excuse me?
5         Q.   When you were driving down Federal Street
6     before the accident happened, were you paying
7     attention to the road conditions and looking
8     straight ahead?
9                    MR. ROUX:  Objection.  You can
10    answer.
11        A.   Yes.
12        Q.   As you drove down Federal Street looking
13    straight ahead paying attention to the road
14    conditions, am I correct that the big white truck on
15    the right-hand side blocked your visibility from
16    anything that was on the sidewalk?
17        A.   Yes.  It was blocking my view completely.
18        Q.   At some point did the police arrive and an
19    ambulance?
20        A.   Yes.
21        Q.   When the police arrived and the ambulance
22    arrived, was the white truck still there?
23        A.   Yes.
24        Q.   Did you talk to the police?
```

```
 1          A.  Yes.
 2          Q.  In your opinion, if that big white truck
 3    was not parked where it was you would have seen that
 4    little boy coming out of the sidewalk, correct?
 5                    MR. FAILLE:  I object.
 6          A.  Possibly.
 7          Q.  Well, if there was nothing else blocking
 8    your vision, why would you have not seen that child
 9    except for that truck blocking your vision?
10          A.  In my opinion I would say that if the truck
11    had not been there, the accident would not have
12    occurred.
13          Q.  Have you completed your answer or do you
14    want to say something else?
15          A.  Yes.  The reason that I say probably is
16    that I do not know where the child was coming from,
17    but for the truck being there.
18          Q.  But do you agree with me that if the truck
19    wasn't there, you probably would have seen the child
20    and the child would have seen the car?
21                    MR. FAILLE:  I object.
22          Q.  In your opinion.
23                    MR. FAILLE:  I object.
24          A.  Yes.
```

```
 1          Q.   There's no doubt in your mind about that,
 2    is there?
 3          A.   Yes.
 4          Q.   Yes, there is a doubt in your mind; or
 5    there's no doubt in your mind?
 6          A.   No.  No, there is none.
 7          Q.   After the accident, did you have a chance
 8    to look around the area where the truck was parked?
 9          A.   Yes.
10          Q.   While you were at the accident scene, did
11    anyone identify themselves as being with the truck,
12    either a driver or person working with the truck?
13          A.   No.
14          Q.   When the accident happened, did you see
15    whether or not anyone was in the truck?
16          A.   No.
17          Q.   Did you look in the part where the driver
18    sits and see anybody sitting in that section of the
19    truck?
20          A.   No.
21          Q.   What about in the passenger seat in the
22    truck, was anyone in there?
23          A.   When I say "no," it's not that there was no
24    one there, it's that I am not sure if there was
```

```
1                          (Off the record.)

2                          (Back on the record.)

3          Q.   Do you remember if -- strike that.   When

4     you saw the child on the ground, was he unconscious?

5          A.   To me he was unconscious because he did not

6     move.

7          Q.   Was he talking?

8          A.   No.

9          Q.   In your opinion, do you believe that

10    because that truck was illegally parked that in part

11    that was the cause of this accident with this child?

12                         MR. FAILLE:  Object.

13         A.   It is one.  Yes, it is the cause of the

14    accident.

15                         MR. ANGUEIRA:  I have no other

16    questions.  Thank you very much, sir.

17                         MR. FAILLE:  I have a couple of

18    questions for you, sir.

19                         CROSS-EXAMINATION

20    BY MR. FAILLE:

21         Q.   Now, you just said that the parked truck

22    was the cause of the accident, right?

23         A.   To my understanding, yes.

24         Q.   So that the little boy running out into the
```

# EXHIBIT "F"

# STEPHEN R. BENANTI

### Traffic Accident
### Reconstruction Specialist

Fifty Wood Street
Groveland, Massachusetts 01834

Phone (978) 373-8328
Pager (781) 226-8541
Fax (978) 373-8329
e-mail: stephen.benanti@comcast.net

## COLLISION RECONSTRUCTION ANALYSIS

## JOHANZ X. SANTOS, ET AL

## VS.

## BOB'S DISCOUNT FURNITURE, ET AL

## U.S. DISTRICT COURT WESTERN DIVISION

## CIVIL ACTION NO.: 03-12210-MLW

## DATE OF COLLISION: MARCH 30, 2002

**PREPARED FOR:**
**ATTORNEY DAVID P. ANGUEIRA**
**SWARTZ & SWARTZ**
**ATTORNEYS AT LAW**

*The undersigned has completed an analysis of this matter. The following represents findings based upon materials you have provided as well as materials I have gathered. If additional information becomes available, I reserve the right to supplement these findings. Opinions expressed are based upon, but not limited to my review of the following:*

## INFORMATION EXAMINED

1.  Springfield Police Department Motor Vehicle Accident Report prepared by Officer Larry Akers.

2.  Written statement of Raeshawn Holmes.

3.  Written statement of Deanna Green.

4.  Written statement of Juan Burgos Montes.

5.  Written statement of Agniliz Acostas.

6.  Written statement of Raul Santos.

7.  Photocopies of photographs of the collision area.

8.  Raul Santos' statement to the Springfield Police Department.

9.  City of Springfield Traffic Regulations.

10. Photocopies of photographs of the Bob's Discount Furniture truck.

11. Deposition of Robert Dawley.

12. Deposition of Raul Santos.

13. Deposition of Agniliz Acostas.

## INFORMATION EXAMINED (continued)

14.     Deposition of Robert Burrus.

15.     American Medical Response records for Johanz Santos.

16.     Baystate Medical Center records for Johanz Santos.

17.     ACORD Automobile Loss Notice.

18.     The St. Paul Business Foundation Series Commercial Auto Claim Coverage for Bob's Discount Furniture, Inc.

19.     Plaintiff Denise Colon's Answers to Interrogatories.

20.     Plaintiff Johanz Santos' Answers to Interrogatories.

21.     Plaintiff Jesus Santos' Answers to Interrogatories.

22.     Color copies of photographs of the collision area.

23.     Color copies of photographs of a Bob's Furniture truck.

24.     Kendrick Forde's personnel file.

25.     Deposition of Jesus Santos.

26.     Deposition of Denise Colon.

27.     Deposition of Johanz X. Santos.

28.     Plaintiff's Production of Documents.

29.     Deposition of Kendrick Forde.

## COLLISION INFORMATION

**Date/Time**       : Saturday, March 30, 2002 @ 2:03 PM

**Location**       : # 27 Federal Street at Pearl Street
                 Springfield, Massachusetts

**Operator 1**    : Raul Santos
**Date of Birth**  : 06/14/73      Age 28
**Address**       : 66 Mattoon Street Springfield, Massachusetts
**License**        : MASS. #S99969427

**Pedestrian 1**   : Johanz X. Santos
**Date of Birth**  : 09/23/94      Age 7
**Address**       : 1813 45th Street Pennsanken, New Jersey

**Vehicle 1**     : 1987 Buick Regal
**Registration**   : MASS. #9428NK
**Owner**        : Agniliz Acostas
**Address**       : 66 Mattoon Street Springfield, Massachusetts

**Passenger 1**   : Agniliz Acostas
**Date of Birth**  : 05/03/72      Age 29
**Address**       : 66 Mattoon Street Springfield, Massachusetts
**Location**      : Front seat passenger side occupant in vehicle #1

## COLLISION INFORMATION (continued)

| | |
|---|---|
| **Passenger 2** | : Juan Burgos-Montes |
| **Date of Birth** | : 06/05/70     Age 31 |
| **Address** | : 40 Washington Street Springfield, Massachusetts |
| **Location** | : Rear seat occupant in vehicle #1 |

| | |
|---|---|
| **Passenger 3** | : Brian Montes |
| **Date of Birth** | : 00/00/00     Age 10 |
| **Address** | : 66 Mattoon Street Springfield, Massachusetts |
| **Location** | : Rear seat occupant in vehicle #1 |

## **VEHICLE INFORMATION**

| | |
|---|---|
| **Vehicle 1** | : 1987 Buick Regal 2 door |
| **Color** | : White |
| **Registration** | : MASS. #9428NK |
| **VIN** | : |
| **Wheelbase** | : 108 inches – 9.00   feet |
| **Length** | : 200 inches – 16.67 feet |
| **Width** | : 71   inches – 5.92  feet |
| **Weight** | : 3,250 pounds |
| **Engine** | : |
| **Transmission** | : Automatic |
| **Brakes** | : Powers assisted hydraulic, front disc and rear drum |
| **Mileage** | : |

Page 6

## SYNOPSIS

It should be strongly noted that the following synopsis is nothing more than a brief outline or general summary of the facts surrounding the events that occurred on Saturday, March 30, 2002 at about 2:03 PM. This synopsis should not be considered a factual report of what actually transpired, but rather should be employed to gain an overview of what transpired. The only purpose of this synopsis is to help the reader have an insight into the kinematics of the alleged collision delineated in this report.

On Saturday, March 30, 2002 at about 2:03 PM Raul Santos was operating a 1987 Buick Regal eastbound on Pearl Street approaching the intersection of Federal Street in Springfield, Massachusetts. Agniliz Acostas was a front seat passenger side occupant in this vehicle. Juan Burgos-Montes was a rear seat occupant in this vehicle. Brian Montes was a rear seat occupant in this vehicle. It was Mr. Santos' intention to turn left onto Federal Street northbound.

At the same time there was a Bob's Discount Furniture Truck parked on the east side of Federal Street in front of building number 27. The truck was parked in a No Parking Anytime zone. Robert Burrus had parked the vehicle and was delivering furniture with Kenrick Forde.

At the same time Johanz Santos was playing with other children in front of the building at #27 Federal Street.

Raul Santos stopped for the stop sign on Pearl Street before turning left onto Federal Street. Mr. Santos did not see the children playing. As the Santos Buick was passing the parked Bob's Discount Furniture truck at an operator stated speed of 6 to 7 MPH, the right rear wheel area came into contact with Johanz Santos. After impact Mr. Santos applied the brakes and brought the vehicle to a stop. He later backed the Buick up off of Johanz Santos. It has been determined that Johanz Santos came into Federal Street in front of the parked Bob's Discount Furniture truck.

The illegally parked Bob's Furniture truck was a view obstruction for Raul Santos and Johanz Santos.

At the time of the accident it was daylight, the weather was clear and the road surface was dry with no defects.

Page 7

## SCENE EXAMINATION

On Sunday, April 10, 2005 I examined, measured and photographed the collision area.  While at the collision site I also conducted drag factor tests and visibility tests.

## Intersection of Federal Street and Pearl Street Springfield, MA.

### Federal Street

Federal Street is a two (2) lane undivided roadway with an asphalt surface.  It travels north and south.  It consists of one northbound lane and one southbound lane. Federal Street is edged with raised granite curbing on both sides.  It is marked with a double solid yellow center line.  Federal Street is relatively straight and flat in the area of the collision.  There are no parking signs located on the both sides in the area of the collision.  Federal Street is about thirty five (35) feet wide.  The northbound lane is fourteen (14) feet wide and the southbound lane is twenty one (21) feet wide.  It is equipped with artificial street lights.  These lights are located on both sides of Federal Street.  There are concrete sidewalks on both sides of Federal Street.  Pearl Street intersects the west side of Federal Street at about a ninety (90) degree angle forming a "T" intersection.  I observed no posted speed limit signs in this area.  This area would best be described as thickly settled commercial and residential.

## SCENE EXAMINATION (continued)

### Pearl Street

Pearl Street is a two (2) lane divided roadway with an asphalt surface. It travels east and west. It consists of one eastbound lane and one westbound lane. The eastbound lane is separated from the westbound lane by a raised traffic island. Pearl Street is edged with raised granite curbing on both sides. Pearl Street is relatively straight and consists of a moderate uphill grade in an eastbound direction at the intersection of Federal Street. There are no parking signs located on the both sides of Pearl Street in this area. It is equipped with artificial street lights. These lights are located on both sides of Pearl Street as well as on the raised center island. Eastbound traffic on Pearl Street is regulated by a stop sign and stop line at the intersection of Federal Street. There is also a crosswalk on Pearl Street in this area. Pearl Street intersects the west side of Federal Street at about a ninety (90) degree angle forming a "T" intersection. I observed no posted speed limit signs in this area. This area would best be described as thickly settled commercial.

### Drag Factor

On Sunday, April 10, 2005 while at the collision area, I conducted the following drag factor tests by placing a Vericom 2000 accelerometer in a passenger vehicle. The passenger vehicle was then test skidded in the northbound lane of Federal Street in a northbound direction in front of #27 Federal Street. At the time of the tests the weather was clear and the road surface was dry. At the time of the collision the weather was clear and the road surface was dry. I recorded a drag factor of .76 on the first test and a drag factor of .80 on the second test.

## SCENE EXAMINATION (continued)

## PHOTOGRAPHS

On Sunday, April 10, 2005 while at the collision area, I took the following photographs. A "No Parking Anytime" sign, which is located on the east side of Federal Street in front of #27 Federal Street, was used as a reference point. Distance measurements on Federal Street follow the contour of the east side of Federal Street.

0.  Photograph taken from the center of the northbound lane of Federal Street facing southbound. Location 200 feet south of the reference point.

1.  Photograph taken from the center of the northbound lane of Federal Street facing southbound. Location 200 feet south of the reference point.

2.  Photograph taken from the center of the northbound lane of Federal Street facing northwest. Location 200 feet south of the reference point.

3.  Photograph taken from the center of the northbound lane of Federal Street facing northbound. Location 200 feet south of the reference point.

4.  Photograph taken from the center of the northbound lane of Federal Street facing northeast. Location 200 feet south of the reference point.

5.  Photograph taken from the center of the northbound lane of Federal Street facing northwest. Location 150 feet south of the reference point.

6.  Photograph taken from the center of the northbound lane of Federal Street facing northbound. Location 150 feet south of the reference point.

7.  Photograph taken from the center of the northbound lane of Federal Street facing northeast. Location 150 feet south of the reference point.

8.  Photograph taken from the center of the northbound lane of Federal Street facing northwest. Location 100 feet south of the reference point.

## SCENE EXAMINATION (continued)

## PHOTOGRAPHS (continued)

9.  Photograph taken from the center of the northbound lane of Federal Street facing northwest. Location 100 feet south of the reference point.

10. Photograph taken from the center of the northbound lane of Federal Street facing northbound. Location 100 feet south of the reference point.

11. Photograph taken from the center of the northbound lane of Federal Street facing northeast. Location 100 feet south of the reference point.

12. Photograph taken from the center of the northbound lane of Federal Street facing westbound. Location 50 feet south of the reference point.

13. Photograph taken from the center of the northbound lane of Federal Street facing northbound. Location 50 feet south of the reference point.

14. Photograph taken from the center of the northbound lane of Federal Street facing northeast. Location 50 feet south of the reference point.

15. Photograph taken from the center of the northbound lane of Federal Street facing northeast. Location 50 feet south of the reference point.

16. Photograph taken from the center of the northbound lane of Federal Street facing northbound. Location at the reference point.

17. Photograph taken from the center of the northbound lane of Federal Street facing northeast. Location at the reference point.

## SCENE EXAMINATION (continued)

## PHOTOGRAPHS (continued)

On Sunday, April 10, 2005 while at the collision area, I took the following photographs. A "No Parking Anytime" sign, which is located on the east side of Federal Street in front of #27 Federal Street, was used as a reference point.

18.    Photograph taken from the east edge of Federal Street facing southbound. Location at the "No Parking Anytime" sign.

19.    Photograph taken from the east edge of Federal Street facing southwest. Location at the "No Parking Anytime" sign.

20.    Photograph taken from the east edge of Federal Street facing westbound. Location at the "No Parking Anytime" sign.

21.    Photograph taken from the east edge of Federal Street facing northbound. Location at the "No Parking Anytime" sign.

22.    Photograph taken from the east edge of Federal Street facing northeast. Location at the "No Parking Anytime" sign.


On Sunday, April 10, 2005 while at the collision area, I took the following photographs. The stop line for eastbound traffic on Pearl Street at the intersection of Federal Street was used as a reference point. Distance measurements follow the contour of a vehicle making a left turn from the center of the eastbound lane on Pearl Street to the center of the northbound lane on Federal Street.

23.    Photograph taken from the center of the eastbound lane of Pearl Street facing southbound. Location at the stop line.

Page 12

## SCENE EXAMINATION (continued)

## PHOTOGRAPHS (continued)

24.    Photograph taken from the center of the eastbound lane of Pearl Street facing northeast. Location at the stop line.

25.    Photograph taken from the center of the eastbound lane of Pearl Street facing northeast. Location at the stop line.

26.    Photograph taken from the center of the eastbound lane of Pearl Street facing northbound. Location at the stop line.

27.    Photograph taken from the center of the eastbound lane of Pearl Street facing northeast. Location 25 feet east of the stop line.

28.    Photograph taken from the center of the eastbound lane of Pearl Street facing northeast. Location 25 feet east of the stop line.

29.    Photograph taken from the center of the eastbound lane of Pearl Street facing northbound. Location 25 feet east of the stop line.

30.    Photograph taken from the center of the eastbound lane of Pearl Street facing northeast. Location 50 feet northeast of the stop line.

31.    Photograph taken from the center of the eastbound lane of Pearl Street facing northeast. Location 50 feet northeast of the stop line.

32.    Photograph taken from the center of the eastbound lane of Pearl Street facing northbound. Location 50 feet northeast of the stop line.

33.    Photograph taken from the center of the eastbound lane of Pearl Street facing southeast. Location 75 feet northeast of the stop line.

34.    Photograph taken from the center of the eastbound lane of Pearl Street facing northeast. Location 75 feet northeast of the stop line.

## SCENE EXAMINATION (continued)

## PHOTOGRAPHS (continued)

35.  Photograph taken from the center of the eastbound lane of Pearl Street facing northeast.  Location 75 feet northeast of the stop line.

36.  Photograph taken from the center of the eastbound lane of Pearl Street facing northbound.  Location 75 feet northeast of the stop line.

37.  Photograph of the "No Parking Anytime" sign.

# VEHICLE EXAMINATION

On Thursday, April 21, 2005 I examined, measured and photographed the Bob's Discount Furniture truck with an exemplar box at Bob's Discount Furniture 135 Memorial Avenue West Springfield, Massachusetts.

It has been represented that the truck available for inspection was the same vehicle involved in this collision and that the exemplar box is substantially similar in all relevant characteristics to the box on the truck at the time of the collision.

| | |
|---|---|
| **Vehicle 2** | : 2000 GMC C6500 box truck  Truck # 2005  Box #169 |
| **Color** | : White |
| **Registration** | : CT. #J96532 |
| **VIN** | : 1GDJ7H1C5YJ507274 |
| **Wheelbase** | : 283 inches – 23.58 feet |
| **Length** | : 432 inches – 36.00 feet |
| **Width** | : 96  inches – 8.00  feet |
| **Weight** | : GVWR 25,950 pounds |
| **Engine** | : Caterpillar |
| **Transmission** | : Automatic |
| **Brakes** | : Powers assisted hydraulic, front and rear disc |
| **Axles/wheels** | : 2 axles, 6 wheels |
| **Mileage** | : 124,924.2 on 4/21/05 |

On Thursday, April 21, 2005 while examining the 2000 GMC truck with exemplar box I made the following measurements:

Height of box – 12.33 feet.  Sign indicates 12.75 feet.

Height of cab – 7.58 feet.

Height of hood – 5.00 feet at the front to 5.75 feet at the windshield.

The passenger side door on the box was located 13.33 feet to 16.83 feet forward from the rear of the box.

Page 15

## CONCLUSIONS AND OPINIONS

The accident occurred on Saturday, March 30, 2002 at about 2:03 PM at #27 Federal Street in Springfield, Massachusetts.

Federal Street in this area is a two (2) lane undivided roadway with an asphalt surface. It consists of one (1) lane for northbound traffic and one (1) lane for southbound traffic. Federal Street is about thirty five (35) feet wide. The northbound lane is fourteen (14) feet wide and the southbound lane is twenty one (21) feet wide. Parking is not allowed at any time on Federal Street in the area of the collision.

Pearl Street intersects the west side of Federal Street forming a "T" intersection. It consists of one lane for eastbound traffic and one lane for westbound traffic. Pearl Street is located south of #27 Federal Street.

At the time of the accident it was daylight, the weather was clear and the road surface was dry with no defects.

Raul Santos was operating a 1987 Buick Regal eastbound on Pearl Street approaching the intersection of Federal Street in Springfield, Massachusetts. Agniliz Acostas was a front seat passenger side occupant in this vehicle. Juan Burgos-Montes was a rear seat occupant in this vehicle. Brian Montes was a rear seat occupant in this vehicle. It was Mr. Santos' intention to turn left onto Federal Street northbound.

There was a Bob's Discount Furniture Truck parked on the east side of Federal Street in front of building number 27. The truck was parked in a No Parking Anytime zone. Robert Burrus had parked the vehicle and was delivering furniture with Kenrick Forde.

The northbound lane of Federal Street is approximately fourteen feet wide in this area. The width of the Bob's Discount Furniture truck was measured at eight (8) feet. Illegally parking the truck in this location would force northbound traffic on Federal Street to enter the southbound lane in order to pass the truck.

Johanz Santos was playing with other children in front of the building at #27 Federal Street. Johanz Santos entered Federal Street in front of the Bob's Discount Furniture truck to retrieve a ball.

Page 16

## CONCLUSIONS AND OPINIONS (continued)

Raul Santos stopped for the stop sign on Pearl Street before turning left onto Federal Street. Mr. Santos did not see the children playing because the Bob's Discount Furniture truck obstructed his view. As the Santos Buick was passing the parked Bob's Discount Furniture truck at an operator stated speed of 6 to 7 MPH, the passenger side of the vehicle in front of the right rear wheel area came into contact with Johanz Santos. After impact Mr. Santos applied the brakes and brought the vehicle to a stop. He later backed the Buick up off of Johanz Santos.

*It is my opinion within a reasonable degree of scientific certainty that the illegally parked Bob's Discount Furniture truck was the reason Raul Santos did not see Johanz Santos or the other children playing in front of the building at #27 Federal Street or Johanz Santos entering Federal Street.*

*It is my opinion within a reasonable degree of scientific certainty that the illegally parked Bob's Discount Furniture truck was the reason Johanz Santos did not see the Santos Buick approaching Federal Street from Pearl Street before Johanz Santos entered Federal Street.*

*It is my opinion within a reasonable degree of scientific certainty that the illegally parked Bob's Discount Furniture truck was a substantial contributing factor causing this collision. If the truck was not parked in this location both the operator of the vehicle and the pedestrian would have been able to see each other and the collision could have been avoided.*

Stephen R. Benanti
Accident Reconstruction Specialist
ACTAR No. 179, BCFE



Page 17

# EXHIBIT "G"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHISETTS

JOHANZ X. SANTOS, ppa, DENISE COLON,  )        C.A. No.: 03- 12210 MLW
DENISE COLON, Individually, JESUS SANTOS,  )
                                          )
                Plaintiffs,               )
                                          )
        v.                                )
                                          )
BOB'S DISCOUNT FURNITURE; REGENT          )
HOME DELIVERY; AGNILIZ ACOSTAS;           )
RAUL SANTOS,                              )
                                          )
                Defendants.               )
                                          )

## **AFFIDAVIT OF COUNSEL**

1.      My name is David P. Angueira, Esq. I am the attorney for Plaintiff in the above captioned matter. I have personal knowledge of the facts herein contained.

2.      On May 6, 2005, I served Plaintiff's Opposition to Defendant, Bob's Discount Furniture's, Motion for Summary Judgment and Plaintiff's Concise Statement of Material Facts With Existing Genuine Issues to be Tried to counsel of record.

3.      Attached to Plaintiff's Opposition are relevant pages of the deposition transcripts of witnesses taken in conjunction with this litigation. All pages are true copies of the sworn testimony of these witnesses.


                                /s/David P. Angueira
                                _____
                                David P. Angueira, BBO# 019610


Dated: May 6, 2005